UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| GABRIEL SEGOVIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:10-0325 |
| | ) | Judge Campbell |
| MONTGOMERY COUNTY, | ) | |
| TENNESSEE and NORMAN LEWIS, | ) | |
| SHERIFF OF THE MONTGOMERY | ) | |
| COUNTY SHERIFF'S DEPARTMENT | ) | |
| IN HIS OFFICIAL AND INDIVIDUAL | ) | |
| CAPACITIES, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

Pending before the Court is the Motion for Summary Judgment (Docket No. 29) filed by Defendants Montgomery County, Tennessee and Sheriff Norman Lewis, in his official and individual capacities. That Motion, which has been fully briefed by the parties, will be granted with respect to all claims, except Plaintiff Gabriel Segovia's retaliation claim under the First Amendment against Montgomery County and Sheriff Lewis in his individual capacity.

### I. FACTUAL BACKGROUND

Plaintiff was an at-will employee of Montgomery County and was hired as a School Resource Officer (SRO) by the Montgomery County Sheriff's Office on July 16, 1999. From the date of hire until his termination in March 2009, Plaintiff worked as an SRO at three different schools in the Clarksville-Montgomery County School system. He was also an elected member of the Clarksville City Council from January 1997 to March 2005, and served as Mayor *pro tem* in 2003-2004.

1

SROs are Deputy Sheriffs assigned on a full time basis to the local middle and high schools. They are there to maintain order, prevent crime, and investigate criminal activity which occurs on school property. They are also responsible for establishing a rapport with students, faculty and the community.

During the 2008-2009 school year, Plaintiff was assigned as the SRO at Clarksville High School. For some of this time, Dr. B.J. Worthington was the interim Principal at the school.

After assuming his duties as interim Principal, Dr. Worthington became concerned that Plaintiff lacked the intuition and problem-solving skills needed of an SRO in the high school setting. Among Plaintiff's problems, in Dr. Worthington's view, was that Plaintiff did not handle problems himself but instead brought them to the administration to resolve. In an effort to address his concerns about Plaintiff, Dr. Worthington contacted Lt. Ron Farley of the Montgomery County Sheriff's Office to see if Lt. Farley could spend a day with Plaintiff at the school and give him some guidance on being an effective SRO.

Lt. Farley went to Clarksville High School on December 1 and 2, 2008, and, while there, observed the school traffic, the interaction of the faculty and students, and Plaintiff's activities. Afterwards, Lt. Farley met with Dr. Worthington and Plaintiff to report his observations and make recommendations. Lt. Farley recommended that Plaintiff improve his visibility on the school grounds, improve his management and supervision of the student parking lot, become more alert and proactive, and "[c]ontinue to read and retain on law enforcement issues, policies, laws and routine situation" because "[k]nowledge will always help you advance your career." (Farley Aff. Ex. 1 ¶4). Lt. Farley's observations and recommendations were reduced to writing and forwarded to Plaintiff's supervisors. Sheriff Lewis was made aware of Lt. Farley's findings.

2

Plaintiff was not disciplined based upon Lt. Farley's observations or report. According to Plaintiff, Lt. Farley told him that Clarksville High School wanted Plaintiff to perform his duties in a manner which was somewhat different from the way that SROs handled their duties at the other schools to which Plaintiff had been assigned in the past.

On February 18, 2009, THE LEAF CHRONICLE, a Clarksville newspaper, published a letter to the editor written by Plaintiff. In the letter, Plaintiff criticized the Mayor's "fly-by-night management style," and criticized the City Council for voting to spend "tens of millions of dollars" on a marina project that was located on property adjacent to the Mayor's property. He also wrote that the Clarksville Department of Electricity was in a "financial mess." Plaintiff further opined that no one, including the City Council and the editorial board of THE LEAF CHRONICLE, had the gumption to challenge the Mayor's "power to do whatever he wants." In the last sentence before closing, Plaintiff wrote, "[t]hese are my personal opinions as a private citizen." (Pf. Depo. Ex. 5).

Two days after the letter was published, Plaintiff was at the Sheriff's Office for a regularly scheduled weekly SRO meeting. What transpired next is the subject of some dispute.

Defendants claim that Plaintiff was asked to meet with Sheriff Lewis in an office across the hall from the meeting room. During their conversation, Sheriff Lewis claims he "counseled" Plaintiff about the cooperative relationship between Montgomery County and Clarksville governmental agencies. Sheriff Lewis also contends he told Plaintiff that, while Plaintiff had the right to express his personal opinions, in the future Plaintiff should consider the fact that, as a former councilman, Plaintiff was a well-known local figure, and also consider the fact that he was an employee of the Sheriff's office. When the conversation ended, Sheriff Lewis claims he considered the matter closed and it played no part in any employment decision regarding Plaintiff. (Lewis Aff.

3

¶ 4).

For his part, Plaintiff alleges that he was ordered out of the SRO meeting and "yelled" at and "berated" by Sheriff Lewis for writing the letter. Plaintiff asserts that Sheriff Lewis "angrily" told him that he could no longer write letters to the newspaper which attacked public officials; that the Sheriff had been asked why he allowed Plaintiff to write such a letter; and that the Sheriff had been taking "heat" because of the letter.[1] Plaintiff claims he then told the Sheriff that he had a constitutional right to free speech and that he would be running for Mayor during the next election, but the Sheriff told Plaintiff he worked for the Sheriff at that point in time. When the Sheriff asked Plaintiff if they had an understanding about not writing any more letters, Plaintiff claims he reiterated that he planned to run for Mayor, to which the Sheriff again asked if they had an understanding. Ultimately, Plaintiff capitulated and said that they did, in fact, have an understanding about Plaintiff writing letters to the newspaper. (Pf. Aff. ¶¶ 20-28).

On March 10, 2009, Plaintiff's supervisor, Sgt. Clifton went to Clarksville High School to follow Plaintiff around and check up on him. Plaintiff asserts that this was the first and only time that Sgt. Clifton came to the high school. Plaintiff also claims that, at the school, Sgt. Clifton repeatedly asked him why he had so many Facebook friends and suggested Plaintiff did so to get votes in the upcoming mayoral election. Plaintiff further asserts that Sgt. Clifton told him that he (Sgt. Clifton) and Jennifer Anderson, an Assistant Principal, laughed about Plaintiff's suitability to be Mayor. (Pf. Aff. ¶¶32-38).

The same day as Sgt. Clifton's visit, the school administrators at Clarksville High School

---

[1] On at least two prior occasions, Plaintiff wrote opinion pieces for THE LEAF CHRONICLE that had to do with local politics. On neither of those occasions was he told by the Sheriff or any department administrator not to express opinions in the local newspaper.

wrote a formal complaint addressed to Sheriff Lewis about Plaintiff's job performance. The complaint outlined a number of concerns and indicated that, despite Lt. Farley's efforts, Plaintiff was not an effective SRO. The administrators asked that Plaintiff be reassigned to another position away from Clarksville High School.

Plaintiff was provided a copy of the complaint and given an opportunity to respond. He claims that up until he received a copy of the complaint, none of the administrators who had signed the complaint had ever expressed concerns to him about the way he performed his duties as an SRO.

On March 20, 2009, ten days after the complaint was sent to Sheriff Lewis, the Sheriff's Office was notified by a reporter at the THE LEAF CHRONICLE that Plaintiff had allegedly improperly texted students. That same day, Sheriff Lewis initiated an Internal Affairs investigation of Plaintiff to look into that allegation, as well as the complaints made by the administrators about Plaintiff's performance as an SRO. Plaintiff was placed on paid administrative leave pending the conclusion of the investigation.

From March 21 through March 25, 2009, Investigators John Stone and Cliff Smith conducted the investigation, during which they recorded interviews of 36 people, and received statements from three individuals. Based upon the statements which were made, the investigation expanded beyond the allegations contained in the complaint from the administrators and the allegation of improper texting, and included allegations that Plaintiff (1) was dishonest (by, among other things, not being where he claimed to be, and falsely claiming that he had dated the daughter of a school Principal); (2) had "personal pictures of a romantic nature" on a work computer; (3) disobeyed a direct order to have no contact with Sheriff department employees after being placed on administrative leave; (4) had engaged in a dating and/or romantic relationship with a student; (5) had attended parties with

5

students and used drugs in their presence; (6) turned a blind eye towards students skipping school to leave for lunch; and (7) was "not suited to law enforcement work." (Docket No. 32-5).

Included among those interviewed was each of the administrators who had signed the complaint. Principal Phyliss Casebolt claimed Plaintiff was not a good fit for the SRO position at Clarksville High School and that she was constantly having to remind Plaintiff what he needed to do and where he needed to be. Each of the Vice Principals also expressed concerns: Stacie Batson did not feel like Plaintiff could be relied upon in a crisis; Jennifer Anderson felt that Plaintiff was slow to react in some circumstances; and Michael Gibson reported at least two occasions when Plaintiff falsely reported his location. Further, during the investigation, two students admitted to sending and receiving text messages from Plaintiff.[2]

Ultimately, Investigators Stone and Smith rejected the allegations that Plaintiff had dated or had a romantic relationship with a student, that he had allowed students to skip school for lunch, and that he had partied with or used drugs in the presence of students. However, the investigators sustained the charges that Plaintiff was dishonest, was insubordinate for talking with a Sheriff's employee during the investigation, had inappropriate pictures on his work computer, and text messaged students. As for the allegation that Plaintiff was not suited for police work, the investigators indicated that the consensus among those interviewed appeared to be that Plaintiff "is a good person, but not a good officer." (Docket No. 32-5 at 11).

Allegedly based upon the complaint of the Clarksville High School administration and the conclusion of the Internal Affairs investigation, Sheriff Lewis decided to terminate Plaintiff's employment. Plaintiff was terminated on March 30, 2009, ostensibly for dishonesty,

---

[2] Using a cell phone during school hours is prohibited under school policy.

insubordination, and conduct unbecoming a member of the Montgomery County's Sheriff's Department.

## II. SUMMARY JUDGMENT STANDARDS

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III. APPLICATION OF LAW

As a result of his termination, Plaintiff filed suit asserting federal constitutional claims under 42 U.S.C. § 1983, and assorted state law claims. Specifically, Plaintiff alleges that Defendants' actions (1) constituted retaliation in violation of the First Amendment to the United States Constitution and the due process clause of the Fourteenth Amendment, (2) violated Plaintiff's First Amendment right to "political association," and (3) deprived Plaintiff of property and his interest in continued employment under the due process clause of the Fourteenth Amendment. Those claims are brought against Montgomery County and Sheriff Lewis in both his official and individual capacity. Additionally, Plaintiff alleges that he was defamed[3] and wrongfully discharged in violation of state law.

Defendants move for summary judgment on each of Plaintiff's claims. They also seek dismissal of the claims against Sheriff Lewis in his official capacity and assert that Sheriff Lewis is entitled to qualified immunity on the individual capacity claims against him. In response, "Plaintiff waives taking issue regarding" his Fourteenth Amendment due process claims, as well as his state law claims (Docket No. 36 at 23 &25), and, accordingly, summary judgment is granted on those claims. Plaintiff does, however, object to dismissal of his First Amendment retaliation and political association claims. He also objects to dismissal of his First Amendment official capacity claims against Sheriff Lewis and argues further that Sheriff Lewis is not entitled to qualified immunity.

Prior to reaching the merits of the remaining claims, however, the Court first addresses an argument raised by Defendants in their reply brief. Defendants devote nearly half of their reply to

---

[3]In his Complaint, Plaintiff also alleged that Defendants conspired to defame him. However, and with leave of Court, the conspiracy allegation was deleted from the Complaint. (Docket No. 14).

8

their contention that this Court should disregard certain portions of Plaintiff's Affidavit because they allegedly contradict his deposition testimony.

Generally, "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts h[is] earlier deposition testimony." Reid v. Sears, Roebuck and Co., 790 F.2d 453, 460 (6th Cir.1986). In Aerel, S.R.L. v. PCC Airfoils, L.L.C., 448 F.3d 899 (6th Cir. 2006), the Sixth Circuit explained how a court should approach arguments that an affidavit conflicts with prior deposition testimony:

> [A] district court deciding the admissibility of a post-deposition affidavit at the summary judgment stage must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony. A directly contradictory affidavit should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction. If, on the other hand, there is no direct contradiction, then the district court should not strike or disregard that affidavit unless the court determines that the affidavit "constitutes an attempt to create a sham fact issue."

Id. at 908-09.

In this case, the Court has considered the excerpts provided from Plaintiff's deposition testimony and the statements in his Affidavit and finds that the challenged statements either are not directly contradictory, or are not material to the Motion for Summary Judgment. For example, Defendants challenge Plaintiff's statement that "following the meeting with Sheriff Lewis, I was never made aware of any complaints regarding my performance." (Pf. Aff. ¶ 30). While that is perhaps an overbroad and inartful statement, the Court does not read the statement as meaning that Plaintiff contends he was never made aware of problems (nor could he since he was provided with a copy of the administrators' complaint and responded thereto). Rather, the Court understands Plaintiff's position to be that during the meeting with Sheriff Lewis and in the weeks thereafter, he was not counseled about any problems, and first understood he might be in trouble when he received

word of the complaint some time after March 20, 2009.[4]

Defendants also challenge Plaintiff's statement in his affidavit that he did not put "romantic photographs" on his computer because he admitted in his deposition that his girlfriend sent him "personal photos" of herself. (Pf. Depo. at 229). However, Plaintiff also testified in his deposition that the three pictures of nude women on the computer were not placed there by him (id.), a fact which finds some support in the investigators' report.[5]

Finally, Plaintiff's statement in his Affidavit that he "was not afforded notice and an opportunity to be heard regarding the propriety of the investigative findings nor my termination" (Pf. Aff. ¶ 65) does not necessarily contradict his deposition testimony that he was given an opportunity to respond to the allegations made against him when he was interviewed by Investigators Stone and Smith. "Notice and an opportunity to be heard" can be viewed as short-hand for a "due process" hearing, and Plaintiff was not given a hearing prior to his termination. Regardless, because Plaintiff has abandoned his due process claims, any alleged inconsistency on that issue is irrelevant.

## A. First Amendment Retaliation Claim

"A government employee does not relinquish all First Amendment rights otherwise enjoyed by citizens just by reason of his or her employment," City of San Diego v. Roe, 543 U.S. 77, 80 (2004), and, therefore, "[t]he First Amendment prohibits retaliation by a public employer against

---

[4]This is supported by Plaintiff's later statement that he was not told of any performance problems when he met with the Sheriff and that the administrators who penned the complaint never told *him* that there was a problem with his performance. (Pf. Aff. ¶¶ 70 & 80).

[5]In the report, the investigators noted that Plaintiff disputed knowledge of the three pictures of a "questionable and/or sexual nature" which were found on the computer and that Plaintiff's explanation was "plausible" given that another Deputy had used the computer before him. (Docket No. 32-5 at 9).

10

an employee on the basis of certain instances of protect speech by the employee." Scarbrough v. Morgan County Bd. of Educ., 470 F.3d 250, 255 (6th Cir. 2006). Nevertheless, not all speech is protected and "a governmental employer may impose certain restraints on the speech of its employees" in light of the mission and function of the employer. Roe, 543 U.S. at 80 & 84. This is in keeping with the notion that "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom," including limitations on the scope of his or her First Amendment rights. Garcetti v. Ceballos, 547 U.S. 410, 418 (2006).

The Supreme Court has recognized two categories of protected speech by a public employee. One category involves matters of public concern which typically deal with items of interest to the public at large. Id. at 80. "Outside of this category, the Court has held that when government employees speak or write on their own time on topics unrelated to their employment, the speech can have First Amendment protection, absent some governmental justification 'far stronger than mere speculation in regulating it.'" Id. (citation omitted).

"To establish an unconstitutional retaliation claim, plaintiff has the burden to prove: (1) that there was constitutionally-protected conduct; (2) an adverse action by defendants sufficient to deter a person of ordinary firmness from continuing to engage in that conduct; and (3) a causal connection between the first and second elements-that is, the adverse action was motivated at least in part by plaintiff's protected conduct." Eckerman v. Tennessee Dept. of Safety, ___ F.3d ___, ___, 2010 WL 5140625 at *4 (6th Cir. Dec. 20, 2010)(citing Sowards v. Loudon County, 203 F.3d 426, 431 (6th Cir.2000)). As with other forms of employment discrimination, a First Amendment retaliation claim can be proved through either direct or circumstantial evidence. See Kreuzer v. Brown, 128 F.3d 359, 363 (6th Cir. 1997).

Direct evidence is evidence which facially exhibits a retaliatory animus. See Kieber v. Honda of America Mfg., Inc., 485 F.3d 862, 868 (6th Cir. 2007). In other words, direct evidence of retaliation exists if, under the employee's version of the facts, no inference is required to conclude that the adverse action was the result of a retaliatory intent. Id. "Circumstantial evidence, on the other hand, is proof that does not on its face establish [retaliatory] animus, but does allow a factfinder to draw a reasonable inference that [retaliation] occurred." Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 570 (6th Cir. 2003).

In this case, Plaintiff's letter to THE LEAF CHRONICLE dealt with matters of public concern and was protected speech.[6] Among other things, the letter addressed concerns about the Mayor and City Council, and how taxpayer money was being spent. Defendants argue that, notwithstanding the protected nature of Plaintiffs' letter, he cannot show retaliation in violation of the First Amendment because he was not fired for writing the letter. Plaintiff argues that he has set forth both direct and circumstantial evidence which shows his termination was in retaliation for his exercise of protected speech.

With respect to direct evidence, Plaintiff references the Affidavit he filed in opposition to the Motion for Summary Judgment. Plaintiff argues that Sheriff Lewis' comments "on February 20, 2009, were sufficiently blunt that the fact finder could construe them as direct evidence of First

---

[6]When speech is made by an employee in his capacity as a private citizen and the speech involves matters of public concern, a court usually must then balance the individual's interest in making the speech against the government's interest in restricting the speech under Pickering v. Bd. of Educ. of Topeka, 391 U.S. 563, 568 (1968). Hughes v. Region VII Area Agency on Aging, 542 F.3d 169, 181 (6th Cir. 2008). Here, however, Defendants specifically concede that "there is no need to assess whether [Plaintiff's] speech should be protected under the balancing test of Pickering and its progeny." (Docket No. 40 at 6 n. 1). See, Pucci v. Nineteenth Dist. Ct., 628 F.3d 752, 768 n. 13)(where defendant offers no argument that governmental efficiency is jeopardized by the speech, the Pickering balancing test is satisfied).

Amendment retaliation[.]" (Docket No. 36 at 15). Plaintiff also argues that "Supervisor Clinton's response that running for mayor was a bad idea" is also direct evidence of discrimination. (Id.)

While Plaintiff does not point to the specific portions of his Affidavit which he claims support his position that Sheriff Lewis' alleged comments are direct evidence of retaliation, the Court has considered Plaintiff's Affidavit in its entirety. In his Affidavit, Plaintiff asserts that two days after the article was published he was called out of a meeting and "yelled" at by Sheriff Lewis, was "angrily told" that he was not allowed to write letters to the editor attacking public officials, and was forced to reach an "understanding" about not writing anymore letters, even though the Sheriff was made aware of Plaintiff's intention to run for Mayor. (Pf. Aff. ¶¶ 20-28).

"Rarely can discriminatory intent be ascertained through direct evidence because rarely is such evidence available." Kline v. Tennessee Valley Auth., 128 F.3d 337, 348 (6th Cir. 1997). After all, an employer is generally not prone to tell an employee that he was fired for a prohibited reason by, for example, stating "'I fire you because you are disabled.'" Smith v. Chrysler Corp., 155 F.3d 799, 805 (6th Cir. 1998).

On a limited number of occasions, the Sixth Circuit has found what could be characterized as direct evidence of discrimination or retaliation. For example, a postal supervisor telling a mail carrier at the time of firing, "you're too old to carry the mail" could be direct evidence of age discrimination. Erwin v. Potter, 79 Fed. Appx. 893, 897 (6th Cir. 2003). Similarly, a prison warden's notation of a correctional officer's race in a disciplinary report could be viewed as direct evidence that the officer was suspended because of her race. Weberg v. Franks, 229 F.3d 514, 523 (6th Cir. 2000). Likewise, in Johnson v. Univ. of Cincinnati, 215 F.3d 561, 577 (6th Cir. 2000), a statement by the university president who allegedly said "[w]e already have two black vice

13

presidents. I can't bring in a black provost" was, if believed by the factfinder, direct evidence of race discrimination.

Here, Sheriff Lewis' statements and Sgt. Clinton's remark are not direct evidence of retaliation. Both require an inference to conclude that Plaintiff was fired for having written the letter. Accordingly, the Court finds that Plaintiff has not provided direct evidence of retaliation, and turns to the question of whether Plaintiff has presented circumstantial evidence sufficient to present a jury question on whether he was fired for having written the letter.

Because Defendants concede for present purposes that Plaintiff engaged in protected activity and suffered an adverse employment action (Docket No. 30 at 8), Plaintiff can prevail by forwarding circumstantial evidence showing that his dismissal "'was motivated at least in part as a response to the exercise of [his] constitutional rights.'" Fox v. Traverse City Area Pub. Schools. 605 F.3d 345, 348 (6th Cir. 2010)(citation omitted). "If the plaintiff meets h[is] burden, the burden then shifts to the defendants to prove by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct." Sowards, 203 F.3d at 431.

In this case, Defendants concede for purposes of their summary judgment motion that Plaintiff engaged in protected activity and that he suffered an adverse employment action. Thus, the critical question becomes whether the decision to fire Plaintiff was based, at least in part, upon his having written the letter to THE LEAF CHRONICLE.

The Supreme Court in Clark County School Dist. v. Breeden, 532 U.S. 268, 272 (2001) observed that courts generally allow a plaintiff to establish the causation element of the *prima facie* case in a retaliation case where the temporal proximity between the protected activity and the challenged act is "very close." The Sixth Circuit allows the inference of a retaliatory motive to be

14

drawn "where the temporal proximity between the protected activity and the adverse employment action is acutely near in time." DiCarlo v. Potter, 358 F.3d 408, 421 (6th Cir. 2004). The outside parameter has been found by some courts to be six months between the protected activity and the adverse employment action. See Mallory v. Noble Correctional Institute, 45 Fed. Appx. 463, 473 (6th Cir. 2002); Nguyen v. City of Cleveland, 229 F.3d 559, 567 (6th Cir. 2000); Parnell v. West, 1997 WL 271751 at *3 (6th Cir. 1997). Still, temporal proximity alone may not be enough in most cases to establish a causal connection, unless there is an "extremely close temporal proximity." Vereecke v. Huron Valley School Dist., 609 F.3d 392, 400 (6th Cir. 2010).

In this case, Plaintiff's termination was acutely near in time to his having engaged in protected activity. Indeed, when the evidence is construed in Plaintiff's favor, it suggests that within two days of writing the letter he was verbally assaulted by the Sheriff, within ten days he was shadowed at the high school by his supervisor for the first time ever, and within a month he was fired. This is sufficient in the Court's view to raise the inference that Plaintiff was terminated because he wrote the letter.

Notwithstanding the temporal proximity, Defendants insist they are entitled to summary judgment on Plaintiff's retaliation claim because Plaintiff's termination was for legitimate reasons, to wit, the complaint from the administrators at the school, and the investigation which showed that Plaintiff had been dishonest, had been insubordinate, had inappropriate pictures on his work computer, and had text messaged students.

Whether the given reasons were the real reasons for Plaintiff's termination, or instead were a mere pretext for retaliation, requires a weighing of the facts by a jury. When the record is construed in Plaintiff's favor, it shows that Plaintiff performed his duties as an SRO at several

15

Montgomery County schools for close to a decade with little or no complaint. While Dr. Worthington voiced certain concerns in December 2008, Lt. Farley allegedly told Plaintiff that those concerns arose from the fact that Clarksville High School expected different things from its SROs than other schools, not that Plaintiff was unable to satisfactorily perform his job as an SRO. Further, while the administrators at Clarksville High School voiced various complaints in March 2009, Plaintiff claims he was not aware of those complaints until the complaint was sent to the Sheriff, after the Plaintiff's opinion letter was published.

As for the internal investigation, many of the charges were not sustained after investigation. Further, Plaintiff has proffered what a jury could determine to be reasonable and innocent explanations for each of the adverse findings in the internal investigation:

- A primary allegation of dishonesty involved whether or not Plaintiff lied about a Principal's daughter who allegedly named a baby after him. However, Plaintiff claims that those statements were made years earlier, and that he did in fact date the woman and believed she named a baby after him. Further, other claims about dishonesty (such as Plaintiff lying about his specific location at the school) are specifically denied by Plaintiff;

- The work computer which allegedly contained "romantic photographs" was previously used by another officer and Plaintiff claims it was that officer who placed offensive pictures on the computer. In their findings, the investigators conceded that the pictures on the computer which were of a "questionable and/or sexual nature" could not be "positively attributed" to Plaintiff. (Docket No. 32-5 at 9).

- Plaintiff claims he never improperly texted students and that all such exchanges dealt with matters which were a part of his job duties, such as trying to determine whether a student was being stalked by a former boyfriend.

- The alleged failure to follow a direct order arose because, according to Plaintiff, he merely decided to ask a Captain if he could be represented by counsel during the investigation.

These versions of the events, if believed, could lead a reasonable trier of fact to conclude that the charges were trumped up or, at a minimum, not sufficient to warrant termination.

The ultimate issue in a First Amendment retaliation case is whether an adverse action "'was taken at least in part because of the exercise of the protected conduct.'" Holzemer v. City of Memphis, 621 F.3d 512, 525 (6th Cir. 2010)(citation omitted). In other words, the question is one of motivation, to wit, whether the same adverse action would have been taken regardless of the protected conduct. Id. However, because "an employer's true motivations are particularly difficult to ascertain," they often present "factual determinations unsuitable for disposition at the summary judgment stage." Singfield v. Akron Metro Housing Auth., 389 F.3d 555, 564 (6th Cir. 2004). In this case, a jury will have to determine whether Plaintiff was fired because he wrote the letter to THE LEAF CHRONICLE, or because he was not fit to be a Montgomery County Sheriff Deputy.

**B. First Amendment Political Association Claim**

"The right of political association is a well established right under the First Amendment for 'political belief and association constitute the core of those activities protected by the First Amendment.'" Sowards, 203 F.3d at 432 (citation omitted). Here, Plaintiff argues that his First Amendment right to political association was "chilled" by Sheriff Lewis' and Sgt. Clifton's response to Plaintiff's statement that he intended to run for Mayor. Plaintiff invites the "Court to adopt the position of many sister circuits that have held, 'disciplinary action discouraging a candidate's bid for elective office represent[s] punishment by the state based on the content of a communicative act protected by the [F]irst [A]mendment.'" (Docket No. 36 at 24, collecting numerous out-of circuit cases). That is an invitation which the Court must decline in light of controlling Sixth Circuit precedent.

In a case involving a deputy court clerk who was terminated by the clerk the day after the deputy announced her intention to run for office in the next election, the Sixth Circuit in Carver v.

17

Dennis, 104 F.3d 847, 850-51 (6th Cir. 1997), held that, while the First Amendment protects the right of public employees to speak out on matters of public concern, the First Amendment does not require a public employer to "nourish the viper in the nest" by protecting employees who announce their candidacy for office. Id. at 853. "Since the Carver decision, panels of [the Sixth Circuit] have both questioned the wisdom of Carver and sought to read it narrowly." Greenwell v. Parsley, 541 F.3d 401, 404 (6th Cir. 2009). Nevertheless, it remains the law in the Sixth Circuit that "the simple announcement of a candidacy . . . does not trigger protected political speech" or protection under the First Amendment. Id. Accordingly, summary judgment is granted on Plaintiff's First Amendment political association claim.

## C. Official Capacity Claims Against Sheriff Lewis

As already noted, Plaintiff sues Sheriff Lewis in both his official and individual capacities. Insofar as he sues that defendant in his official capacity, the suit is "is nothing more than a suit against [Montgomery] County itself." Petty v. County of Franklin, 478 F.3d 341, 349 (6th Cir. 2007)(citing, Kentucky v. Graham, 473 U.S. 159, 166 (1985)). This is because an official capacity suit is but "another way of pleading an action against an entity of which an officer is an agent," with "the real party in interest" being "the governmental entity and not the named official." Hafer v. Melo, 502 U.S. 21, 25 (1991).

In this case, the real party in interest for purposes of Plaintiff's First Amendment claims is Montgomery County. Since Montgomery County is a Defendant herein, the claims against Sheriff Lewis in his official capacity are dismissed. See Nance v. Wayne County, 2009 WL 3245399 at *6 (M.D. Tenn. 2009)(dismissing official capacity claims against county mayor and sheriff where county was already a named defendant).

**D. Qualified Immunity And Individual Capacity Claims Against Sheriff Lewis**

Qualified immunity is an affirmative defense[7] which shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Generally, the qualified immunity inquiry involves first determining whether a constitutional violation occurred, and, if so, a subsequent determination of whether the right infringed was clearly established. McKinley v. City of Mansfield, 404 F.3d 418, 429-30 (6th Cir. 2005). However, while this sequence "is often appropriate, it should no longer be regarded as mandatory." Pearson v. Callahan, 129 S.Ct. 808, 818 (2009). Instead, courts should use "their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id.

In their moving papers, Defendants concede "that the right to be free from political retaliation in employment is a clearly established right held by employees of the public sector." (Docket No. 30 at 16). Therefore, the only basis for Sheriff Lewis being cloaked with qualified immunity is that Plaintiff did not suffer the deprivation of a constitutional right. Since the Court has already ruled that factual issues surround Plaintiff's First Amendment retaliation claim, Sheriff Lewis is not entitled to qualified immunity on that claim.

**IV. CONCLUSION**

On the basis of the foregoing, Defendants' Motion for Summary Judgment (Docket No. 29) is granted in part and denied in part. The Motion is granted with respect to Plaintiff's First

---

[7]Plaintiff argues that Defendants waived the qualified immunity defense by not raising it in their Answer. However, under the heading "Eighteenth Defense and Motion" in the Answer, Defendants specifically aver that Defendant Lewis was acting at all times as the Sheriff of Montgomery County "and is entitled to qualified immunity." (Docket No. 9 at 11).

19

Amendment political association claim, and his state law claims for wrongful discharge and defamation. The Motion is denied with respect to Plaintiff's First Amendment retaliation claim and Defendant's assertion that Sheriff Lewis is entitled to qualified immunity. Further, the claims against Sheriff Lewis in his official capacity are dismissed. This case will proceed on Plaintiff's First Amendment retaliation claim against Defendant Montgomery County and Defendant Lewis in his individual capacity.

_____
Todd J. Campbell
United States District Judge